# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 17-0010v
Filed: November 6, 2019

| | | |
|---|---|---|
| * * * * * * * * * * * * * | * | |
| ROGER LAMARRE, | * | PUBLISHED |
| | * | |
| Petitioner, | * | |
| v. | * | |
| | * | Dismissal; Influenza Vaccination; SIRVA; |
| | * | Severity Requirement; Motion for a Ruling |
| SECRETARY OF HEALTH | * | on the Record |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * | * | |

*Amy Senerth, Esq.*, Muller Brazil, LLP, Dresher, PA, for Petitioner.
*Debra Begley, Esq.*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION DENYING ENTITLEMENT[1]

**Oler**, Special Master:

On January 4, 2017, Roger Lamarre ("Petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq.*[2] ("Vaccine Act" or "the Program"). Petitioner alleges that the influenza ("flu") vaccination he received on November 5, 2015, caused him to experience a right shoulder injury. *See* Petition ("Pet."), ECF No. 1.

Upon review of the evidence submitted in this case, I find that Petitioner has failed to carry his burden demonstrating that he has met the statutory requirements of §300aa-11(c)(1)(D). In particular, Petitioner has failed to show by preponderant evidence that he has met the Vaccine Act's severity requirement. Accordingly, the petition is dismissed.

---

[1] This decision will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet**. As provided in 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the decision's inclusion of certain kinds of confidential information. To do so, each party may, within 14 days, request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, this decision will be available to the public in its present form. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

1

**I. Procedural History**

On January 4, 2017, Petitioner filed his petition, alleging that the flu vaccination caused him to suffer from a right shoulder injury.[3] Along with his petition, Petitioner filed exhibits 1-4.

An SPU staff attorney held an initial status conference on February 22, 2017 and directed Petitioner to file additional medical records by April 7, 2017. Specifically, the SPU attorney told Petitioner to file additional evidence demonstrating six months of sequelae. ECF No. 8 at 1. Petitioner filed additional records on April 7, 2017 and May 16, 2017. Ex. 5-7.

On September 1, 2017, Respondent filed his Rule 4(c) Report ("Resp't's Rep."). Along with his position, Respondent submitted a Motion to Dismiss ("Resp't's Mot."), arguing that Petitioner had not met the six-month severity requirement under the Act. Respondent contended that even if Petitioner were able to attribute his November and December 2015 symptoms to his vaccination, the medical records do not support a finding that Petitioner's June 2016 right bicep injury was sequela of the vaccination and initial injury. *Id*. at 5. Respondent concluded that Petitioner's shoulder symptoms following vaccination resolved, and Petitioner suffered "a separate and unrelated injury" in June 2016. *Id*. at 6. Finally, Respondent added that Petitioner "has also failed to establish that he received his flu vaccine in his right arm." *Id*. As such, Respondent argued that Petitioner's case should be dismissed. *Id*. at 7.

On November 11, 2017, Special Master Roth held a status conference in order to discuss the six-month severity requirement. ECF No. 22. The Special Master clarified that Petitioner's medical records still did not demonstrate six months of sequelae following vaccination. Petitioner's counsel requested additional time for Petitioner to consult with his orthopedic specialist regarding a connection between his right shoulder pain in November 2015 and his bicep rupture in June 2016. Special Master Roth directed Petitioner to file a status report by December 15, 2017.

On December 18, 2017, Petitioner filed his overdue status report. ECF No. 24. In that report, Petitioner confirmed that he had submitted attendance records from his karate class. He requested additional time to file affidavits, gym records, and an expert report in support of his petition and the six-month severity requirement.

On January 2, 2018, Petitioner filed two affidavits, authored by himself and his son, Mr. Ben Lamarre. Ex. 10-11. On February 15, 2018, Respondent filed a status report, indicating his intent to defend this case. ECF No. 28. He requested the following additional records that had still not been filed: 1) podiatrist records from 2014 to present, 2) complete gym attendance records from 2014 to present, and 3) karate class attendance records from 2014 to present. Respondent further advised Petitioner to preserve his social media account and requested a status conference following Petitioner's filing of all requested documents.

---

[3] This case was initially assigned to the Special Processing Unit ("SPU"). It was reassigned to Special Master Roth on September 6, 2017 (ECF No. 20) before being assigned to my docket on June 8, 2018 (ECF No. 40).

Over the next several months Petitioner filed records from his podiatrists, Facebook, gym, and karate class and, on April 17, 2018, represented that the record was complete. ECF No. 33. Respondent filed a status report on July 9, 2018, disagreeing that the record was complete. ECF No. 42. Respondent stated that Petitioner had not yet filed complete gym records from Anytime Fitness. *Id*. On August 2, 2018, I directed Petitioner to file any additional gym records. ECF No. 43. Petitioner represented on September 4, 2018 that all records had been filed.

I held a status conference on October 30, 2018. *See* Minute Entry of 10/30/2019; *see also* ECF No. 45. I informed the parties that Petitioner had seemingly proved the location of the injection site by preponderant evidence. ECF No. 45 at 1. However, I did not believe that Petitioner had met the Vaccine Act's statutory six-month severity requirement. *Id*. I clarified that the records do not indicate that Petitioner's right shoulder pain lasted from November 5, 2015, the date of vaccination, to May 5, 2016, six months after the date of vaccination. *Id*. Petitioner's counsel stated that the records were indicative of continued shoulder pain lasting for more than six months. *Id*. I told Petitioner's counsel that I disagreed, and that Petitioner should express his assertions in a responsive brief to Respondent's Motion to Dismiss. *Id*. at 2; see also Vaccine Rule 5 (which allows a special master to make tentative findings).

On November 29, 2018, Petitioner filed his responsive brief to Resp't's Mot., stating that Petitioner should prevail under a summary judgment standard. Petitioner's Response ("Pet'r's Resp."), ECF No. 46. Petitioner urged that Resp't's Mot. should be denied because the medical records and affidavits "all demonstrate that Petitioner, more likely than not, suffered the residual effects of his right shoulder injury for more than six (6) months following vaccination of November 5, 2015." *Id*. at 2. Petitioner first lists the medical appointment with Dr. Salisbury on February 2, 2016 as evidence of continuing shoulder pain.[4] *Id*. at 2-3. Second, Petitioner states that shoulder pain is listed under reviewed problems, history of past symptoms, and problems sections on March 7, 2016 and May 9, 2016. *Id*. at 3. This, Petitioner argues, is evidence that Petitioner sought treatment for his shoulder pain on those dates. Finally, Petitioner states that he was advised by his orthopedist that there was no resolution, so Petitioner's affidavits provide evidence of modified activities and the use of bands and braces. *Id*. at 3.

On December 20, 2018, Respondent filed his reply brief. Respondent's Reply ("Resp't's Reply"), ECF No. 48. Respondent reiterated that Petitioner had not met the six-month severity requirement. Respondent added that Petitioner, in November 2017, had requested an "opportunity to discuss [this issue] with [P]etitioner's orthopedic [physician]," yet no statement from a treating doctor or expert report was filed. *Id*. at 2. Respondent requested a ruling on the record, resolving any factual disputes based on a preponderance of the evidence standard. *Id*.

On June 26, 2019, my chambers requested confirmation, by informal communication, from the parties that all evidence pertaining to the Motion to Dismiss had been filed in order for a

---

[4] On February 2, 2016, Petitioner did visit Dr. Salisbury but not for right shoulder pain. Petitioner mistakenly recounts this visit as one for right shoulder pain in his petition, his first affidavit, and his responsive brief. On February 2, 2016, Petitioner presented to Dr. Salisbury for dizziness, cough, and nasal drip. Ex. 2 at 46-49.

3

decision to issue. Petitioner responded on July 11, 2019, indicating that Petitioner wished to retain an expert to address the six-month severity issue. Respondent replied that same day with his objection.

I held a status conference on August 14, 2019 to discuss Petitioner's most recent request to obtain an expert. *See* Minute Entry on 8/15/2019; *see also* ECF No. 49. During that conference, Petitioner's counsel confirmed that no further records were pending but that Petitioner requested additional time to seek an expert opinion. ECF No. 49 at 1. Respondent objected, citing Petitioner's lengthy opportunity to procure expert support for his case. *Id*. I stated that I would not prohibit Petitioner from seeking an expert opinion. I further stated that while an expert may be able to opine as to a causal connection between weakened muscle and a bicep tear, they would not be able to offer further factual evidence on this matter, as the contemporaneous medical records speak for themselves. *Id*. at 2. Counsel requested thirty days to speak with her client regarding how to proceed. *Id*. at 2.

On September 16, 2019, Petitioner filed a status report requesting a decision "resolving the outstanding factual issues in this case." ECF No. 50. I held a status conference on September 25, 2019, to discuss Petitioner's status report. ECF No. 51. During the conference, I told counsel that to establish the severity requirement in this case, Petitioner would need to file an expert report articulating a connection between his shoulder injury from November 2015 and his biceps tendon tear from June 2016. *Id*. at 1. Petitioner's counsel indicated that Petitioner did not intend to file an expert report and requested a ruling on the record. *Id*.

On October 10, 2019, the parties filed a joint status report, indicating that neither party intended to file additional evidence and that the record was ready for a ruling regarding entitlement on this existing record. ECF No. 52.

**II. Factual Background**

Prior to the vaccination, Petitioner's medical records are significant for a history of hypertension, hyperlipidemia, anxiety, depression, dysuria, back pain, right bicep surgery, foot pain, multilevel degenerative disc disease, bursitis of left hip, and allergic rhinitis. *See generally* Ex. 1-18. In 2003, Petitioner underwent right bicep surgery, "requiring repair at the elbow." *See* Ex. 3 at 2, 3; Ex. 2 at 28; Ex. 4 at 2; *see also* Ex. 7 at 1.

On December 8, 2013, Petitioner presented to Garden City Treatment Center ("GCTC") with upper right back pain. Ex. 4 at 2. Onset was noted as three days prior and the pain was documented as "sharp pain" that "comes and goes." Petitioner reported that the pain was located between the scapula and T-spine on the right side. *Id*. at 3. It was noted that Petitioner exhibited a full range of motion in his right shoulder.

On November 5, 2015, Petitioner received an influenza vaccination at the office of his primary care physician, Dr. Dennis Botelho. Ex. 1 at 1; Ex. 2 at 56. The vaccination record indicates that the vaccine was administered in his left arm. Ex. 1 at 1. On November 10, 2015, Petitioner called Dr. Botelho's office to report right shoulder pain since his flu shot and to ask whether he should schedule a visit. Ex. 5 at 2. He was informed that his flu shot was given in his

left arm and that pain following vaccination was normal. *Id*. at 2, 5. Petitioner disagreed that the vaccination was given in his left arm. *Id*. at 2. Petitioner called back the next day to report "extreme pain in [his] right shoulder."[5] *Id*.

Petitioner presented to GCTC on November 14, 2015 with a ten-day history of right shoulder pain. Ex. 2 at 14-16; Ex. 4 at 7. The record indicates an acute onset of shoulder pain, and Petitioner was assessed with right shoulder ligament strain. *Id*. Imaging was conducted and showed no evidence of acute injury. Ex. 4 at 16. However, there was a possible benign lesion below the humeral head. *Id*.

On November 16, 2015, Petitioner presented to Dr. Botelho with right shoulder pain.[6] Ex. 2 at 49-52. The record indicates that he was cradling his arm with his other hand and denied any trauma or injury. *Id*. at 49. Dr. Botelho assessed him with right shoulder pain and advised the use of anti-inflammatories and heat on the affected area. *Id*. at 52.

Petitioner presented to Orthopaedic Associates, Inc. on November 23, 2015 with right shoulder pain. Ex. 3 at 3. Dr. Louis Mariorenzi assessed Petitioner with synovitis of right shoulder and noted it to be a new problem. *Id*. Petitioner reported that his right shoulder pain began after receiving the flu vaccination three weeks prior. *Id*. Under past medical history, Dr. Mariorenzi listed "repair of a right thumb amputations from a table saw injury, biceps tendon repair at the right arm, and appendectomy." *Id*. Petitioner was prescribed Mobic and directed to continue general ROM exercises. *Id*.

Petitioner returned to Dr. Mariorenzi on December 21, 2015 for continued right shoulder pain. Ex. 8. Dr. Mariorenzi assessed Petitioner and recommended he continue a home exercise program and follow up in three weeks. *Id*.

On February 2, 2016, Petitioner was seen at his primary care physician's office by Dr. Matthew Salisbury for dizziness, cough, nasal drip.[7] Ex. 2 at 46-49. Petitioner presented with "nose/sinus problems" and was diagnosed with allergic rhinitis and dizziness, a possible side effect of blood pressure medication. *Id*. at 49. There was no indication at this appointment of reported shoulder pain.

---

[5] On October 25, 2016, Petitioner called the office to inform them that the vaccination record was incorrect and that his flu shot from November 2015 was administered in his right arm. This record was ultimately corrected to note the administration of the vaccine in Petitioner's right arm.

[6] Though Petitioner presented for shoulder pain, Petitioner's prior medical issues were all listed under "Reviewed Problems." Ex. 2 at 49. Subsequent medical visits indicate that new issues were added to the "Reviewed Problems" section as they arose but were not generally removed to reflect individual appointment concerns.

[7] In the petition, his initial affidavit, and his brief, Petitioner incorrectly identifies this appointment as one where he sought treatment from Dr. Matthew Salisbury for right shoulder pain. He refers to this appointment as the visit described on pages 49-52 of Exhibit 2 of the medical records. The medical visit to which Petitioner refers is actually for the November 16, 2015 visit with Dr. Botelho.

5

Petitioner presented to Dr. Botelho for a follow up appointment on March 7, 2016. Ex. 2 at 41-46. Dr. Botelho noted Petitioner's "history of hyperlipidemia, hypertension, allergies, back pain, shoulder pain, and dizziness." *Id*. at 42. At this appointment, Petitioner denied dizziness and stated that he felt better since the change in blood pressure medication. *Id*. He added that he had a cough for the past month and had "no other concerns." *Id*. Dr. Botelho assessed Petitioner with ongoing hyperlipidemia, hypertension, allergic rhinitis, and cough. *Id*. at 46. There was no indication in the record of ongoing shoulder pain at this visit.

On April 10, 2016, Petitioner presented to GCTC. Ex. 4 at 10. At this visit, Petitioner complained of lower back injury, sustained during a karate class on April 7, 2016. *Id*. He was diagnosed with back sprain/strain and prescribed medication for pain management. *Id*. Imaging of the lumbar spine indicated lumbar spondylosis with the most significant changes at L4-L5 and L5-S1. Ex. 4 at 16. The records for this visit did not indicate Petitioner experienced shoulder pain.

On May 9, 2015, Petitioner presented to Dr. Botelho with complaints of foot pain. Ex. 2 at 38-41. Petitioner reported that "his [right] foot has been hurting him for a long time." He added that he had received cortisone injections from a podiatrist and has a history of hammertoe on the second and third toes of the right foot. He denied any other concerns. Dr. Botelho assessed him with hammer toe and neuroma in the right foot. He recommended Petitioner visit Dr. David Greenberg, a podiatrist. There was no indication in this record of shoulder pain.

Petitioner returned to GCTC on June 25, 2016 for right arm injury. Ex. 4 at 13. Petitioner indicated that he was "moving plywood and felt a pop on upper rt bicep." Onset was noted as "two days ago" "after feeling a pop." Petitioner was assessed with a deltoid muscle injury sustained "while lifting sheet of plywood." *Id*. at 14. Imaging of the right humerus "showed no evidence for fracture, dislocation or other significant bony abnormality and the soft tissue shadows are normal." Ex. 4 at 18.

On July 7, 2016, Petitioner presented to Dr. Botelho for an annual examination. Ex. 2 at 33-37. Dr. Botelho performed a complete evaluation of all of Petitioner's concerns, including his rupture of the right bicep tendon. *Id*. at 37. Petitioner was assessed with essential hypertension, hyperlipidemia, spontaneous rupture of tendon of biceps, and dietary management surveillance. *Id*.

On July 8, 2016, Petitioner returned to Dr. Mariorenzi for his right bicep injury. Ex. 3 at 2. Dr. Mariorenzi noted that Petitioner's rupture of the right bicep tendon was a new problem. Petitioner reported that "a few weeks ago he felt a popping sensation at the right shoulder and subsequent prominence of the distal biceps muscle." Dr. Mariorenzi further noted that Petitioner's right biceps muscle had required past repair at the elbow. He also noted that "[t]he patient's symptoms and physical findings are consistent with a rupture of the long head of the right biceps tendon at the shoulder." *Id.*

Petitioner sought treatment with Dr. Phillip Reilly for his torn right bicep on November 29, 2016 at West Bay Orthopaedics and Neurosurgery, Inc ("WBON"). Ex. 6 at 2-8. Petitioner presented to WBON with a four-month history of right biceps tear. Ex. 6 at 6. The record indicates

6

that he had "an acute tearing sensation and subsequently had pain and deformity." *Id*. Therapy was recommended as an initial step. No therapy records were submitted.

No further medical records pertinent to this issue were submitted.

## III. Documentary Evidence

### A. Affidavits

    1. <u>First Affidavit of Petitioner</u>

On May 16, 2017, Petitioner authored his first affidavit. He stated that he received a flu vaccination in his right arm on November 5, 2015. Ex. 7 at 1. Following the receipt of his vaccination, Petitioner recalled that he immediately felt pain in his right arm, bicep, and shoulder, and his strength was limited by 50%. *Id*. Petitioner noted that he had suffered a "ruptured biceps tendon in [his] right elbow while lifting weights," in 2003 and that surgery was required in order to repair this injury. *Id*. Petitioner clarified that he had recovered from this injury by the time of vaccination. *Id*.

Petitioner stated that on November 14, 2015, he sought treatment for his symptoms from Dr. Botelho. Ex. 7 at 2. He then recalled his visit to Dr. Mariorenzi on November 23, 2015, who recommended a follow-up in two weeks. *Id*. Petitioner stated that due to work and the holidays, he cancelled the follow-up appointment. *Id*.

Petitioner claimed that the next time he sought treatment for his arm pain was on February 2, 2016.[8] Ex. 7 at 2. Petitioner recalled presenting to Dr. Salisbury for his right shoulder injury and that Dr. Salisbury recommended visiting Dr. Mariorenzi. *Id*. However, Petitioner stated that at that point, he was "losing faith in doctors trying to treat my injured shoulder." *Id*.

Petitioner stated that he enjoyed golfing and light exercise and owned a home remodeling business. Ex. 7 at 1. Following the vaccination, however, Petitioner claimed that his ability to perform manual labor was limited. *Id*. at 2. He stated that the use of anti-inflammatories was ineffective, and he treated his pain with the use of a sling and 800mg Ibuprofen three times per day. *Id*.

Petitioner next recalled his June 2016 injury. Ex. 7 at 2. He stated that he was assisting his son in the remodel of his daughter's home. *Id*. Petitioner stated that while lifting a 15-20 lb. piece of plywood with his son, he felt a pop in his right arm. *Id*. He likened the feeling to the pain he felt after the vaccination. *Id*. He stated that the strength in his arm and shoulder was limited to 25%. *Id*.

---

[8] Petitioner mistakenly claims in his affidavit and his response to Respondent's Motion to Dismiss that he presented to Dr. Salisbury on February 2, 2016 with complaints of right shoulder pain. Petitioner did not visit Dr. Salisbury for right shoulder pain on February 2, 2016. On that date, Dr. Salisbury treated Petitioner for dizziness, cough, and nasal drip. Ex. 2 at 46-49. His last visit at that office for right shoulder pain was on November 16, 2015. *Id*. at 49-52.

7

Petitioner recalled several medical visits with Dr. Botelho, Dr. Mariorenzi, and Dr. Reilly, during which he sought treatment for his ruptured bicep tendon. Ex. 7 at 2. He stated that in late 2016 or early 2017, Dr. Reilly prescribed physical therapy for his injury. *Id*. Petitioner stated that he attended two sessions but found them to be painful and did not return. *Id*.

   2. Second Affidavit of Petitioner

On January 2, 2018, Petitioner filed a second affidavit. *See* Ex. 10. Petitioner reiterated that he suffered right shoulder pain immediately following his November 5, 2015 vaccination. *Id*. He recalled the appointments with treaters in November and December 2015, during which he sought treatment for his right shoulder pain.[9] *Id*. at 1-2. Petitioner stated that he did not seek treatment after December 2015 because Dr. Mariorenzi told him that there was no other solution and he "lost faith in doctors." *Id*. at 1. Petitioner added that he modified his regular activities in order to cope with the shoulder pain, and he stopped going to the gym and reduced his karate class attendance. *Id*. at 2. Petitioner stated that he firmly believes that his right bicep tear was a result of his vaccination and not from moving plywood. *Id*.

   3. Affidavit of Mr. Ben Lamarre

Mr. Ben Lamarre, Petitioner's son, submitted an affidavit on January 2, 2016. *See* Ex. 11. He stated that he has worked with his father in his remodeling business since 2014. *Id*. at 1. He recalled that in November of 2015, Petitioner complained about his right shoulder "[feeling] funny" since the vaccination. *Id*. He claimed that his father's arm never recovered, and Mr. Lamarre had to take over the remodeling portion of his father's business. *Id*. He recalls that in June 2016, his father was helping him move a bulky piece of plywood when Petitioner felt a pop in his shoulder. *Id*. He noted that in the past, his father could lift two plywood pieces without incident. *Id*.

   **B. Additional Documentary Evidence**

On February 22, 2018, Petitioner submitted his karate class attendance records for 2015 and 2016. Ex. 12. The records indicate that prior to his vaccination, Petitioner attended class five days in August 2015 and four days in both September and October 2015. *Id*. at 1. Following his vaccination, Petitioner attended the following number of classes per month: four days in November 2015, five days in December 2015, seven days in January 2016, six days in February 2016, five days in March 2016, four days in April 2016, and five days in May 2016. *Id*. The records further illustrate that Petitioner did not attend classes from June 2016 through the remainder of the year and resumed classes on January 17, 2017. *Id*. at 1, 2.

Additionally, on May 15, 2018, Petitioner filed his gym attendance records. Ex. 17, 18. The records do not contain any evidence of attendance in 2015. Ex. 18 at 2. In 2016, Petitioner utilized his gym membership on four days in March 2016, six days in April 2016, four days in May 2016, and one day in June 2016. *Id*. No other gym records were filed. *Id*.

---

[9] Notably, Petitioner did not claim that he sought treatment for right shoulder pain on February 2, 2016.

**IV. Applicable Law**

    **A.  Petitioner's Overall Burden in Vaccine Program Cases**

Under the Vaccine Act, a petitioner may prevail in one of two ways. First, a petitioner may demonstrate that he suffered a "Table" injury—i.e., an injury listed on the Vaccine Injury Table that occurred within the time period provided in the Table. § 11(c)(1)(C)(i). "In such a case, causation is presumed." *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B). Second, where the alleged injury is not listed in the Vaccine Injury Table, a petitioner may demonstrate that he suffered an "off-Table" injury. § 11(c)(1)(C)(ii).

For both Table and non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. § 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1324 (Fed. Cir. 2010); *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.,* 931 F.2d 867, 873 (Fed. Cir. 1991).

Medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing … that mandates that the testimony of a treating physician is sacrosanct -- that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should also be weighed against other, contrary evidence also present in the record -- including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Caves v. Sec'y of Health & Human Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 Fed. App'x 765 (Fed. Cir. 2012).

Petitioners in the Vaccine Program are required to demonstrate that they meet the Vaccine Act's six-month severity requirement.[10] A petitioner must show by preponderant evidence that he

---

[10] Specifically, §300aa-11(c)(1)(D) of the Vaccine Act requires that a Petitioner either show that: (1) he "suffered the residual effects or complications of [his alleged shoulder pain] for more than 6 months after the administration of the vaccine" (*see* §300aa-11(c)(1)(D)(i)); (2) that he "died from the administration of the vaccine" (*see* §300aa-11(c)(1)(D)(ii)); or (3) that his shoulder pain "resulted in inpatient hospitalization and surgical intervention" (*see* § 300aa-11(c)(1)(D)(iii)).

or she suffered from sequela of their vaccine-related injury for more than six months following the date of vaccination. §11(c)(1)(D). Petitions are frequently dismissed or denied for failure to satisfy this statutory requirement. *See Wagner v. Sec'y of Health & Human Servs.*, No. 17-1388V, 2019 WL 3297509 (Fed. Cl. Spec. Mstr. May 8, 2019), *mot. for review denied*, 2019 WL 2866786 (Fed. Cl. June 4, 2019); *see also Watts v. Sec'y of Health & Human Serv.*, No. 17-1494V, 2019 WL 4741748 (Fed. Cl. Spec. Mstr. Aug. 13, 2019)(citing *Gerami v. Sec'y of Health & Human Servs.*, 127 Fed. Cl. 299 (2014)(upholding dismissal of case on basis of failure to meet severity requirement, where record did not establish injury lasted more than three months, and Petitioner could not persuasively vary record with physician letter prepared in anticipation of lawsuit that was not otherwise corroborated by record evidence.)).

### B. Legal Standard for Fact Finding

Petitioner bears the burden of establishing her claim by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In order to make a determination concerning factual issues, such as the timing of onset of petitioner's alleged injury, the special master should first look to the medical records. "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2006 WL 3734216, at *8 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). Medical records created contemporaneously with the events they describe are presumed to be accurate and complete. *Doe/70 v. Sec'y of Health & Human Servs.,* 95 Fed. Cl. 598, 608 (2010).

Contemporaneous medical records generally merit greater evidentiary weight than oral testimony; this is particularly true where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992)(citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")). "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records--for instance in cases where records are found to be incomplete or inaccurate. *Campbell*, 69 Fed. Cl. at 779 ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves,

inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825 (Fed. Cl. Spec. Mstr. Apr. 10, 2013)(citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). A special master making a determination whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at a hearing must have evidence suggesting the decision was a rational determination. *Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

## V. Analysis

I find that Petitioner in this case has not provided preponderant evidence to establish that his shoulder injury or its residual effects continued for more than six months. As such, I find that Petitioner did not meet the Vaccine Act's six-month severity requirement and, therefore, is not entitled to compensation under the Vaccine Program.

### A. Petitioner's Injection Site and Onset of Right Shoulder Pain

As an initial matter, I find that Petitioner experienced right shoulder pain following his November 5, 2015 flu vaccination. The medical records support Petitioner's claims that his vaccination was likely administered in his right arm and that Petitioner developed pain following his vaccination.

First, I find the medical records establish that Petitioner's vaccination was administered in his right arm. The records initially indicated that the vaccination was administered in his left arm. These records were altered to indicate the right arm over a year after the vaccination date. However, the supplemental patient records detailing Petitioner's phone conversations with Dr. Botelho's office clarify this issue. On November 10, 2015, Petitioner called Dr. Botelho's office complaining of right shoulder pain since his vaccination and inquired whether he should schedule a visit. He was told that he received the vaccination in his left arm and that some pain following vaccination was normal. The following day, on November 11, 2015, Petitioner called again regarding his shoulder pain. During this phone call, he recalled for the nurse his conversation on the previous date, that he had been told the vaccination was given in his left arm. He informed the nurse that the vaccination had actually been given in his right arm and, since that date, he has suffered from tremendous pain.

11

I find these records of the phone conversations between Petitioner and Dr. Botelho's office to be persuasive. Though the record was not altered to reflect the right arm as the vaccine administration site until October 2016, Petitioner noted his disagreement with the record within five days of his vaccination.

Second, Petitioner's medical records support an onset of right shoulder pain within 48 hours after his flu vaccination. On November 10, 2015, five days post-vaccination, Petitioner called Dr. Botelho's office to complain of right shoulder pain since his flu shot and inquired whether he should schedule a visit. Then, on November 14, 2015, ten days post-vaccination, Petitioner reported to GCTC with a ten-day history of right shoulder pain. Finally, on November 23, 2015, Petitioner sought treatment from Dr. Mariorenzi. At that appointment, Petitioner stated that his shoulder pain began after his flu shot three weeks prior.

I find the medical records to be clear and consistent with regards to onset. Petitioner reported his shoulder pain within five days and dated the pain back to the shot. Petitioner then sought treatment for his shoulder pain within ten days, again dating the pain back to his vaccination. As such, I find that Petitioner's right shoulder pain began within 48 hours of his flu vaccination.

### B. Six-Month Severity Requirement

Petitioner did not present preponderant evidence to establish that he meets the Vaccine Act's six-month severity requirement. The Vaccine Act requires that Petitioner suffer from the residual effects of his right shoulder injury for at least six months following his November 5, 2015 vaccination. I find, however, that the medical records and additional objective evidence indicate that Petitioner's shoulder pain did not continue past December 2015. Instead, these records indicate that he suffered a second, separate injury in June 2016 not connected to his vaccination.

1. <u>Medical Records</u>

The medical records indicate that Petitioner did not suffer the residual effects of his right shoulder injury after December 2015. As discussed above, Petitioner did present with right shoulder pain immediately following his vaccination. Petitioner sought treatment from both his primary care physician and his orthopedic specialist, Dr. Mariorenzi, throughout November and December 2015. On December 21, 2015, Dr. Mariorenzi recommended that Petitioner continue a home exercise program and follow-up in three weeks. There are no records indicating that Petitioner followed-up with Dr. Mariorenzi in three weeks. Between February and June 2016, Petitioner presented for seven different medical visits to Dr. Botelho's office, GCTC, his urologist, and a podiatrist for a myriad of other symptoms. (February 2, 2016, Ex. 2 at 46-49; March 7, 2016, Ex. 2 at 41-46; April 9, 2016, Ex. 4 at 10; April 25, 2016, Ex. 2 at 12; May 9, 2016, Ex. 2 at 38-41; May 19, 2016, Ex. 2 at 9-11; June 20, 2016, Ex. 2 at 8). However, the medical records indicate that Petitioner did not complain of shoulder pain or seek treatment for shoulder pain at any of those visits.

Then, on June 25, 2016, Petitioner presented to GCTC for a right bicep injury. He stated that he was "moving plywood and felt a pop on [his] upper [right] bicep," and indicated the onset of his injury as *two days prior*. The medical records do not note any mention of previous or ongoing shoulder pain. Further, on July 8, 2016, Petitioner presented again to Dr. Mariorenzi for his right bicep injury. Dr. Mariorenzi noted this injury as a new problem.

I find that the medical records indicate Petitioner's June 25, 2016 injury was a new issue caused by the lifting of plywood two days prior. The records do not create any link between Petitioner's right shoulder pain following vaccination and his right biceps injury. Though Petitioner states in his affidavits that he had continued right shoulder pain prior to this secondary injury, I am persuaded by contemporaneously created medical records that are clear and consistent. These medical records illustrate that Petitioner sought treatment for a multitude of injuries after December 2015, including back pain and foot pain, but did not seek further treatment for his shoulder.

Similarly, I do not find persuasive Petitioner's claim that his June 25, 2016 injury was a continuation of his previous shoulder pain. At his GCTC visit on June 25, 2016, Petitioner himself attributed his bicep injury to heavy lifting, noted the onset of his injury as two days prior, and did not allude to any ongoing shoulder pain. Subsequent medical visits also date his right bicep injury back to the plywood lifting incident with no mention of Petitioner's previous right shoulder pain (*See* Ex. 2 at 37, medical visit on July 7, 2016 where Petitioner was assessed with "spontaneous rupture of other tendons, right upper arm."; Ex. 3 at 2, medical visit on July 8, 2016 where the records indicate "a few weeks ago [Petitioner] felt a popping sensation at the right shoulder and subsequent prominence of the distal biceps muscle."; Ex. 6 at 6, medical appointment from November 29, 2016 where the "history of present illness" section states, "about four months post a right proximal biceps tear. He had acute tearing sensation and subsequently had pain and deformity."). I believe these consistent medical records provide persuasive evidence that Petitioner's initial right shoulder pain resolved soon after his December 21, 2015 appointment with Dr. Mariorenzi, and Petitioner then suffered a secondary, unrelated right arm injury while lifting plywood in June 2016. There is no evidence in the record that connects Petitioner's shoulder pain from November 2015 with his arm injury from June of 2016.

Finally, I am not persuaded by Petitioner's argument in Pet'r's Resp. that the listing of shoulder pain under "History" in the medical records suggests ongoing treatment for shoulder pain. It is evident from the records that the "History" section contains all past issues, and assessments for each respective visit are found under the regularly updated "Assessment/Plan" section. Moreover, in his second affidavit, Petitioner admits to not seeking medical treatment for his shoulder pain after December 21, 2015. Ex. 10 at 1.

2. Karate and Gym[11] Records

Petitioner submitted his karate class records and gym attendance records to provide evidence that his right shoulder injury forced him to reduce his participation in both. I do not find

---

[11] Petitioner submitted gym records from March to May of 2016. As there are no records from prior to the vaccination or the months immediately following the vaccination, these attendance records do not provide information regarding the effect of Petitioner's right shoulder pain on his physical activity.

13

either indicative of continued right shoulder pain; rather, I find that the karate records more likely indicate a *resolution* of his shoulder pain.

In the months preceding vaccination, Petitioner attended karate class between four and five times per month. Ex. 12. After his vaccination on November 5, 2015, his attendance for the remainder of the year was unchanged, as he attended karate four days in November and five in December. *Id*. His attendance subsequently increased, however, to seven days in January 2016, six days in February, and five days in March. *Id*. Petitioner attended four days in April and five days in May. *Id*. He suspended his attendance in June 2016 until January 17, 2017. *Id*.

As evidenced above, I do not view Petitioner's karate class or gym records as supportive of continued right shoulder pain past December 2015, since Petitioner's highest attendance in karate class was in January and February of 2016. In fact, Petitioner's continued class attendance and suspension of attendance in June 2016 provide evidence supporting a resolution of his right shoulder pain in December of 2015 and the onset of a new injury in June 2016. Accordingly, I am not persuaded that Petitioner continued to suffer from right shoulder pain after December 2015 or that his physical activity suffered as a result of said pain.

3. Affidavits

In order to overcome the presumption that contemporaneous written medical records are accurate, testimony must be "consistent, clear, cogent, and compelling." *Blutstein*, 1998 WL 408611, at *5. Because of this presumption, "special masters in this Program have traditionally declined to credit later testimony over contemporaneous records." *Sturdivant v. Sec'y of Health & Human Servs.,* No. 07-788V, 2016 WL 552529, at *15 (Fed. Cl. Spec. Mstr. January 21, 2016). *See, e.g., Stevens v. Sec'y of Health & Human Servs*., No. 90–221V, 1990 WL 608693, at *3 (Cl. Ct. Spec. Mstr. December 21, 1990); see also *Vergara v. Sec'y of Health & Human Servs*., No. 08–882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. July 17, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."); *see also, Cucuras*, 993 F.2d at 1528 (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight").

Petitioner submitted three affidavits, two authored by himself and one from his son. In his affidavits, Petitioner stated that he did not continue to seek treatment for his right shoulder pain because he "[lost] faith" in his treaters' ability to resolve his issue. He clarified, however, that despite the lack of treatment, his pain was continuous and ongoing at the time of his June 25, 2016 injury. Petitioner alleged that his right bicep tear in June 2016 was a result of his vaccination and not from lifting plywood.

Petitioner's affidavits do not overcome the contemporaneous medical records filed in this case. Those records indicate that Petitioner sought treatment for his shoulder injury only twice from his orthopedic specialist before deciding not to return. Petitioner was recommended for a follow-up visit to his December 21, 2015 appointment if his pain continued, but he did not present

for another visit with Dr. Mariorenzi. During the two appointments with Dr. Mariorenzi, Petitioner was not prescribed physical therapy or a steroid injection. Petitioner did not return for a follow-up to consider such options. He attended seven medical appointments without mention of shoulder pain. Finally, when Petitioner did present for a right bicep injury in June 2016, he made no mention of ongoing right shoulder pain at that or any subsequent appointment and instead stated that his arm pain began two days prior when lifting plywood.

Accordingly, I have concluded that the medical records and medical histories, provided close-in-time to Petitioner's injuries, are more persuasive than the affidavits presented by Mr. Lamarre and his son between 18 months and two years after the fact. For that reason, I am not persuaded that Petitioner's right shoulder pain following vaccination extended beyond December 2015.

## VI. Conclusion

Upon careful evaluation of all the evidence submitted in this matter--including the medical records, physical activity records, and affidavits, I find that Petitioner has not established by preponderant evidence that he has met the Vaccine Act's statutory six-month severity requirement. Petitioner's affidavits and other documentary evidence in the face of contrary medical record evidence do not carry his burden of persuasion. Accordingly, Petitioner's claim for compensation is dismissed.

In the absence of a timely-filed motion for review (see Appendix B to the Rules of the Court), the clerk shall enter judgment in accord with this decision.[12]

**IT IS SO ORDERED.**

                        **s/ Katherine E. Oler**
                        Katherine E. Oler
                        Special Master

---

[12] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.